# In the United States Bankruptcy Court
# for the
# Southern District of Georgia
## Savannah Division

**FILED**
Lucinda B. Rauback, Clerk
United States Bankruptcy Court
Savannah, Georgia
By DReese at 5:18 pm, Mar 28, 2017

In the matter of:                )
                                 )
CHARLES W. COKER, JR.,           )        Chapter 7
                                 )
                *Debtor.*        )        Number 15-40215-EJC
                                 )
_____  )   _____
GRAY TYBEE II, LLC,              )
GRAY TYBEE III, LLC,             )
PANNELL PROPERTIES II, LLC       )
PANNELL PROPERTIES III, LLC      )
                                 )
                *Plaintiffs,*    )
                                 )        Adversary
v.                               )
                                 )        Number 15-04040-EJC
CHARLES W. COKER, JR.,           )
                                 )
                *Defendant.*     )

## OPINION ON DEBTOR'S MOTION FOR SUMMARY JUDGMENT

In 2009, the plaintiffs Gray Tybee II, LLC ("Tybee II"), Gray Tybee III, LLC (Gray Tybee III"), Pannell Properties II, LLC ("Pannell II"), and Pannell Properties III, LLC ("Pannell III") (collectively, the "Plaintiffs") entered into a real estate transaction with the Debtor[1] which included a "buy-back" provision that allowed Plaintiffs, at their option, to sell the purchased real estate back to the Debtor[2] after three years. The Plaintiffs exercised their

---

[1] The actual seller of the property was Quinnco Hinesville, LLC ("Quinnco"), of which the Debtor and Michael F.P. Maloney ("Maloney") were the sole members.

[2] Under the buy-back contracts, the Purchasers were Quinnco, the Debtor and Maloney, but the Debtor was obligated "to fulfill the entirety of the Purchaser's obligations." (Adv. Dckt. 23-2, Ex. 8).

option under the "buy-back" provision in 2012, but the Debtor defaulted on his obligation to purchase the property. As a result of this default, the Debtor and Plaintiffs entered into a settlement agreement, which required the Debtor to execute a promissory note in favor of the Plaintiffs. After the Debtor defaulted on the promissory note, Plaintiffs filed a lawsuit to recover on the note and obtained a $4,393,294.00 judgment against the Debtor on December 3, 2014.

The Debtor filed for Chapter 7 bankruptcy relief on February 11, 2015. On August 10, 2015, the Plaintiffs filed the instant adversary proceeding seeking a determination from this Court that their judgment against the Debtor is non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(B). The Plaintiffs allege that the Debtor deliberately provided false personal financial statements to the Plaintiffs for the purpose of inducing them to enter into the real estate transaction in 2009 and the subsequent settlement agreement in 2012.

Pending before the Court is the Debtor's Motion for Summary Judgment (adv. dckt. 22) filed on April 11, 2016. First, the Debtor asserts that summary judgment is appropriate because the Settlement Agreement's merger clause bars the Plaintiffs from bringing this adversary proceeding based on § 523(a)(2)(B). In addition, the Debtor argues that he is entitled to summary judgment because the evidence in this case demonstrates as a matter of law that the Plaintiffs did not actually rely on the Debtor's personal financial statements, and to the extent that there was any reliance, it was not reasonable. As will be explained, the Court finds that the merger clause does not preclude the Plaintiffs from bringing this adversary proceeding and that genuine issues of material fact exist as to the Plaintiffs' reliance on the Debtor's financial statements. Accordingly, the Court will deny the

Debtor's Motion for Summary Judgment.

## I. JURISDICTION

The Court has subject-matter jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334(a), 28 U.S.C. § 157(a), and the Standing Order of Reference signed by then Chief Judge Anthony A. Alaimo on July 13, 1984. This is a "core proceeding" under 28 U.S.C. § 157(b)(2)(I) (providing that core proceedings include "determinations as to the dischargeability of particular debts").

## II. BACKGROUND

### A. The Real Estate Transaction

In the fall of 2008, James Pannell and Thomas Gray, the sole members of the Plaintiffs[3], began to make plans to sell their interest in a building located at 218 West State Street in Savannah, Georgia. (Adv. Dckt. 23, Ex. 1). In order to defer the taxes owed on the gains from the sale of this building, Pannell and Gray decided to pursue a "like-kind" exchange under Section 1031 of the Internal Revenue Code (a "1031 Exchange"). *Id.* In basic terms, a 1031 Exchange allows a taxpayer to defer the payment of taxes on any gain realized from the sale of property (the "underlying property") by reinvesting the proceeds from the sale into another similar property or properties (the "replacement property"). *See* 28 U.S.C. § 1031. However, to qualify for a 1031 Exchange, the taxpayer must identify and designate the replacement property within forty-five (45) days from the sale of the underlying property. 28 U.S.C. § 1031(a)(3)(A). The taxpayer must also close on the replacement property within

---

[3] Pannell is the 100% owner of Pannell II and Pannell III. Gray is the 100% owner of Tybee II and Tybee III.

180 days of selling the underlying property. 28 U.S.C. § 1031(a)(3)(B). In order to confirm that the requirements of a 1031 Exchange have been met, the IRS requires that the taxpayer complete a Form 8824 and file it with his or her tax return.

On November 25, 2008, Pannell and Gray sold their interest in the 218 West State Street property. (Adv. Dckt. 23, ¶ 7). Thus, to qualify for a 1031 Exchange, they were required to designate a replacement property by January 9, 2009. Ultimately, Pannell and Gray, through Plaintiffs, designated the following three tracts of land in Hinesville, Georgia as their replacement properties:

> 1) Pannell, through Pannell II, would purchase a 5.4 acre tract of land known as Tract F-1B2;
>
> 2) Gray, through Tybee II, would purchase a 5.4 acre tract of land known as F-1B1; and
>
> 3) Pannell and Gray, through Pannell III and Tybee III, would jointly purchase a 7.6 acre tract of land known as F1-A1A.

(collectively, the "Independence Tracts[4]") (Adv. Dckt. 23, Ex. 5). According to the 8824 Forms filed by Pannell and Gray, they identified and designated the Independence Tracts as their replacement property on November 25, 2008. (Adv. Dckt. 23, Ex. 6). However, Pannell and Gray claim that the designation did not actually occur until January 9, 2009, the last day required to make their replacement property designation.

On March 23, 2009, the Plaintiffs purchased the Independence Tracts from Quinnco for a total of $2,434,527.00. *Id.* As part of this transaction, Quinnco and its two

---

[4]These three tracts of land were part of a larger tract owned by Quinnco known as the Independence Commercial Tract.

AO 72A
(Rev. 8/82)

primary members, Debtor and Maloney, executed separate buy-back agreements for each tract (the "Buy-Back Agreements"). These Buy-Back Agreements gave the Plaintiffs the option, after three years, of selling the Independence Tracts back to Quinnco, the Debtor and Maloney at a combined price of $2,975,384.00. (Adv. Dckt. 23, Ex. 8).

At the end of the three-year period, the Plaintiffs exercised their option under the Buy-Back Agreements. (Adv. Dckt. 23, Ex. 1). However, the Debtor and Maloney were unable to purchase the Independence Tracts and defaulted on their obligations under the Buy-Back Agreements. *Id.* In early April 2012, the parties began settlement discussions regarding the Debtor's default of the Buy-Back Agreements. On April 5, 2012, Pannell sent an email to the Debtor outlining a proposed settlement agreement in which Plaintiffs would accept promissory notes from Quinnco, the Debtor and Maloney totaling $2,052,190.23 (the "Settlement Agreement"). (Adv. Dckt. 23, Ex. 9). On May 7, 2012, the parties entered into the Settlement Agreement and attached the promissory notes as exhibits. (Adv. Dckt. 23, Ex. 11). Among other provisions, the Settlement Agreement extended the closing date on the buy backs to December 17, 2012. *Id.* The Settlement Agreement also contained a merger clause, which provided, in pertinent part:

> This Settlement Agreement, along with the Exhibits as executed and delivered, constitutes the entire and complete agreement between the parties here to and supersedes any prior oral or written agreement between the parties with respect to the obligations and covenants contemplated hereunder.

*Id.*

Ultimately, the Debtor defaulted on the promissory note related to the Settlement Agreement. On December 26, 2012, after this default, the parties entered into a

subsequent agreement whereby the Independence Tracts were deeded back to Quinnco and in exchange the Debtor and Maloney executed a new promissory note to Plaintiffs totaling $2,975,384.00[5]. The Debtor defaulted on his payment obligations under this new promissory note. As a result, the Plaintiffs filed suit in the Superior Court of Chatham County to recover on the promissory note, which resulted in a $4,314,340.59 judgment against the Debtor.

B. The Debtor's Personal Financial Statements

As part of the negotiations for the purchase of the Independence Tracts, the Plaintiffs requested a personal financial statement ("PFS") from the Debtor. According to Plaintiffs, the Debtor's PFS was necessary to ensure that the Debtor had the financial ability to "buy-back" the properties. On January 19, 2009, the Debtor emailed the Plaintiffs a joint financial statement of he and his wife (the "2009 PFS"), which listed the following assets and liabilities:

| Assets | | | Liabilities | | |
|---|---|---:|---|---|---:|
| Cash: | $ | 60,000.00 | Primary Residence  Mortgage: | $ | 650,000.00 |
| Marketable Securities: | $ | 1,978,000.00 | Wholly-Owned RE Mortgage: | $ | 901,000.00 |
| Insurance and Annuities: | $ | 215,000.00 | Partially Owned RE Mortgage: | $ | 3,062,000.00 |
| Primary Residence: | $ | 850,000.00 | Notes Payable: | $ | 1,100,000.00 |
| Bluffton SC River House: | $ | 2,500,000.00 | Credit Card Balance: | $ | 8,000.00 |
| 5 Acre Cashiers NC : | $ | 380,000.00 | Contingent Liabilities[6]: | $ | 265,000.00 |

[5]The amendment to the Settlement Agreement is not in the record.

[6]In the January 19, 2009 email, the Debtor drew special attention to the fact that he did not include as a contingent liability his share of the repurchase guarantee under the Buy-Back Agreements. He made no reference to the more significant contingent liability, namely his $7,596,390.59 unconditional guaranty to The Heritage Bank.

AO 72A
(Rev. 8/82)

| Partially Owned Real Estate: | $ | 11,016,000.00 | | |
|---|---|---|---|---|
| Family Trust: | $ | 500,000.00 | | |
| Retirement Plans: | $ | 451,000.00 | | |
| Other Assets: | $ | 750,000.00 | | |
| **Total:** | **$** | **18,700,000.00** | **Total:** | **$   5,986,000.00** |

(Adv. Dckt. 1, Ex. 1). The 2009 PFS was not signed or dated[7] by the Debtor.

The Plaintiffs contend that the Debtor's 2009 PFS contained several material misrepresentations as to the Debtor's financial condition. Among the misrepresentations, the Plaintiffs contend that the Debtor failed to disclose the entire extent of his liability on the debt related to the Independence Commercial Tract. In the 2009 PFS, the Debtor indicated that he held a partial ownership interest in the Independence Commercial Tract (with a listed market value of $7,200,00.00) and that he owed a $2,500,00.00 debt on that property. However, the Plaintiffs assert that the Debtor failed to disclose a $7,596,390.59 unconditional guaranty to The Heritage Bank for a loan associated with the Independence Commercial Tract, which he executed on December 30, 2008. (Adv. Dckt. 45).

Further, Plaintiffs contend that the Debtor misrepresented his ownership interest in the "Bluffton SC River House" (the "Bluffton River House"). The 2009 PFS lists this property as wholly-owned by the Debtor and his wife with a market value of $2,500,000.00 and a corresponding debt of $600,000.00. However, Plaintiffs assert that the Debtor and his wife own only 54% of the property, with the remaining interests held by their four daughters directly or in trusts.

---

[7] The only date on the 2009 PFS was a typed dated of "Jun-08."

On April 17, 2012, as part of the Settlement Agreement negotiations, the Debtor emailed an updated personal financial statement (the "2012 PFS") to the Plaintiffs, which listed the following assets and liabilities:

| Assets | | | Liabilities | | |
|---|---|---|---|---|---|
| Cash: | $ | 25,000.00 | Primary Residence  Mortgage: | $ | 600,000.00 |
| Marketable Securities: | $ | 2,205,000.00 | Wholly-Owned RE Mortgage: | $ | 220,000.00 |
| Insurance and Annuities: | $ | 560,000.00 | Partially Owned RE Mortgage: | | $ 4,850,000.00 |
| Primary Residence: | $ | 3,050,000.00 | Notes Payable[8]: | | $ 2,370,000.00 |
| Wholly-Owned Real Estate: | $ | 260,000.00 | | | |
| Partially Owned Real Estate: | $ | 3,950,000.00 | | | |
| Other Business Assets: | $ | 750,000.00 | | | |
| Retirement Plans: | $ | 450,000.00 | | | |
| Other Assets: | $ | 250,000.00 | | | |
| **Total:** | **$** | **11,500,000.00** | **Total:** | | **$ 8,040,000.00** |

(Adv. Dckt. 1, Ex. 3).

The Plaintiffs contend that the 2012 PFS also contained several material misrepresentations, including the failure to list the Debtor's $7,596,390.59 unconditional guaranty with The Heritage Bank[9] and once again listing the Bluffton River House as wholly-owned. In addition, the Plaintiffs assert that the 2012 PFS falsely indicated the Debtor and his wife owned various life insurance policies, which insured the lives of the Debtor's

---

[8] Schedule 6 of the 2012 PFS indicates a $1,000,000.00 note payable to "Pannel & Grey." This is inaccurate.

[9] By the time the Debtor filed for bankruptcy on February 11, 2015 he identified Heritage Bank as an unsecured creditor with an unliquidated claim of $13,617,143.81. (Dckt. 1).

parents, with a cash value of $450,000.00[10] and a face amount of $3,000,000.00.

C. Procedural History

On February 11, 2015, the Debtor filed his Chapter 7 bankruptcy petition. (Dckt. 1). In his schedules, the Debtor listed Plaintiffs jointly as an unsecured creditor with a $4,314,340.59 claim arising from the above-mentioned default judgment entered by the Superior Court of Chatham County. *Id.* On August 11, 2015, the Plaintiffs filed this adversary proceeding seeking a determination that their claims against the Debtor are non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(B). (Adv. Dckt. 1). Specifically, the Plaintiffs assert that the Debtor's personal financial statements, which allegedly contained false representations, were provided by the Debtor for the purpose of inducing Plaintiffs to purchase the Independence Tracts and later enter into the Settlement Agreement. *Id.* at ¶ 22.

On April 11, 2016, the Debtor filed a Motion for Summary Judgment arguing that he is entitled to summary judgment on two grounds: 1) the Settlement Agreement contained a merger clause which prohibits Plaintiffs from bringing this adversary based upon alleged misrepresentations that occurred prior to the Settlement Agreement; and 2) the undisputed evidence in this case shows that Plaintiffs did not reasonably rely on the 2009 PFS when purchasing the Independence Tracts, nor did they reasonably rely on the 2012 PFS in making the decision to enter into the Settlement Agreement. (Adv. Dckt. 21).

---

[10]In his bankruptcy schedules, the Debtor indicated that he owned four life insurance policies with face values totaling $3,000,000.00 and a total cash value of $0.00. (Dckt. 1).

## III. DISCUSSION

### A. Summary Judgment Standard

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A factual dispute is genuine "if the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party." *Id.* at 248. The party moving for summary judgment has "the initial responsibility of informing . . . the court of the basis for its motion" and demonstrating the absence of a genuine issue of material fact. *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991). What is required of the moving party, however, depends on whether the moving party has the ultimate burden of proof on the issue at trial.

> When the nonmoving party has the burden of proof at trial, the moving party is not required to 'support its motion with affidavits or other similar material negating the opponent's claim' (citations omitted) in order to discharge this 'initial responsibility.' Instead, the moving party simply may 'show – that is, point out to the . . . court – that there is an absence of evidence to support the nonmoving party's case. (citations omitted). Alternatively, the moving party may support its motion for summary judgment with affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial.

*Four Parcels*, 941 F.2d at 1437 (citing *Celotex*, 477 U.S. at 323-31).

Once this burden is met, the nonmoving party cannot merely rely on allegations or denials in its own pleadings. Fed. R. Civ. P. 56(e). Rather, the nonmoving party must present specific facts that demonstrate there is a genuine dispute over material facts. *Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 918 (11th Cir. 1993). When reviewing a motion for

summary judgment, a court must examine the evidence in the light most favorable to the nonmoving party and all reasonable doubts and inferences should be resolved in favor of the nonmoving party. *Id.*

### B. The Merger Clause Defense

As an initial matter, the Debtor argues that the merger clause in the Settlement Agreement bars the Plaintiffs from bringing this dischargeability proceeding under § 523(a)(2)(B). Essentially, it is the Debtor's theory that under Georgia law, the merger clause prohibits the Plaintiffs from making claims of fraud or deceit based upon misrepresentations in the Debtor's financial statements because they were provided prior to the execution of the Settlement Agreement. In Georgia, it is true that a valid merger clause in an agreement may prevent a plaintiff from bringing fraud claims pertaining to pre-contractual representations made by a defendant. *First Data POS, Inc. v. Willis*, 273 Ga. 792, 795 (2001). However, based on the Supreme Court's holding in *Archer v. Warner*, 538 U.S. 314 (2003), the Court finds that the Debtor's argument has no merit.

In *Archer*, the parties settled a lawsuit under which Warner (the debtor) paid the Archers (the plaintiffs) $200,000.00 and executed a promissory note in the amount $100,000.00. In exchange, the Archers released all of their claims against Warner, including a claim for fraud. Warner failed to make any payments under the note, and filed for Chapter 7 bankruptcy relief. The Archers then objected under 11 U.S.C. § 523(a)(2)(A) to the dischargeability of their claim for $100,000.00 on the ground that the debt the parties had settled was procured by fraud. The Supreme Court held that "the Archers' settlement

agreement and releases may have worked a kind of novation, but that fact does not bar the Archers from showing that the settlement debt arose out of 'false pretenses, a false representation, or actual fraud,' and consequently is nondischargeable [under] 11 U.S.C. § 523(a)(2)(A)." *Archer*, 538 U.S. at 320.

The Supreme Court reasoned that the Bankruptcy's Codes nondischargeability provision indicated that Congress intended the fullest possible inquiry to ensure that all debts arising out of fraud are excepted from discharge, no matter their form. *Archer*, 538 U.S. at 320 (citing *Brown v. Felsen*, 442 U.S. 127 (1979)). Further, Congress "intended to allow the relevant determination (whether a debt arises out of fraud) to take place in bankruptcy court, not to force it to occur earlier in state court at a time when nondischargeability concerns 'are not directly in issue and neither party has a full incentive to litigate them.'" *Archer*, 538 U.S. at 321 (citing *Brown*, 442 U.S. at 134).

Based on the Supreme Court's reasoning in *Archer*, a number of courts have found that creditors are free to look beyond a settlement to determine the character of the debt for nondischargeability purposes. *In re Marino*, 2009 WL 361386 at *5 (Bankr. M.D. Fla. 2009); *In re Burrell-Richardson*, 356 B.R. 797, 802 (B.A.P. 1st Cir. 2006) (noting that *Brown* and *Archer* have been widely applied by bankruptcy courts in examining the underlying nature of a debt regardless of its form); *In re Schwartz*, 2007 WL 3051865 at *3 (Bankr. S.D. Tex. 2007) ("In § 523 proceedings, the relevant inquiry focuses on the conduct from which the debt originally arose. Liable parties cannot erase history of a debt's origin through a settlement and subsequent breaches of the settlement.").

This Court finds the Supreme Court's reasoning applicable in this case. Here, the Plaintiffs assert that the Debtor used false financial statements to induce them into entering the real estate transaction, as well as the subsequent Settlement Agreement. However, the Debtor attempts to argue that the Settlement Agreement's merger clause effectively bars the Plaintiffs from bringing such a claim based on the Debtor's pre-settlement financial statements. However, if, under *Archer*, a settlement agreement will not bar a § 523(a)(2) dischargeability complaint, neither will a merger clause within that settlement agreement serve to bar the same action. Accordingly, the Court finds that neither the Settlement Agreement, nor its merger clause, prevents the Court from inquiring into the true nature of the Plaintiff's debt against the Debtor; that is, whether it arose out of the Debtor's use of a materially false statement respecting his financial condition.

Because the Court finds that the Settlement Agreement's merger clause does not prohibit the Plaintiffs from bringing this dischargeability proceeding, summary judgment is not appropriate on such basis.

### C. 11 U.S.C. § 523(a)(2)(B)

In their Complaint, the Plaintiffs seek a judgment from this Court declaring the Debtor's debt due to Plaintiffs non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(B), which provides that any debt "for money, property, services, or an extension, renewal, or refinancing of credit" is non-dischargeable "to the extent obtained by" a written statement:

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive.

11 U.S.C. § 523(a)(2)(B). At trial, Plaintiffs bear the burden of establishing each of these elements by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 111 (1991). Accordingly, if any one of these elements is not met, the debt at issue is dischargeable. In his Motion for Summary Judgment, the Debtor asserts that he is entitled to summary judgment on the basis that the Plaintiffs' cannot satisfy the "reasonable reliance" element of 11 U.S.C. § 523(a)(2)(B)(iii)[11]. Accordingly, the Court need not address the other elements under § 523(a)(2)(B).

The reliance element of § 523(a)(2)(B)(iii) requires that Plaintiffs prove that (1) they actually relied on the financial statement and (2) the reliance was reasonable[12]. *In re Jones*, 197 B.R. 949, 961 (Bankr. N.D. Ga. 1996). A financial statement does not have to be the only factor influencing a creditor, as partial reliance is all that is needed. *In re Anzo*, 547 B.R. 454, 467 (Bankr. N.D. Ga. 2016). "The reasonable reliance analysis is done on a case-by-case basis considering the totality of the circumstances." *In re McDowell*, 497 B.R. 363, 370 (Bankr. N.D. Ga. 2013). Among the circumstances that might affect the reasonableness of a creditor's reliance are:

---

[11]The Debtor does not concede that Plaintiffs can prove the remaining elements of 11 U.S.C. § 523(a)(2)(B). (Adv. Dckt. 22, n.1). However, the Debtor does not believe the other elements would be appropriate for summary judgment. *Id.*

[12] "Reasonable reliance connotes the use of the standard of the ordinary and average person." *City Bank & Trust Co. v. Vann (In re Vann)*, 67 F.3d 277, 280 (11th Cir.1995).

AO 72A
(Rev. 8/82)

1) whether the creditor had a close personal relationship or friendship with the debtor;

2) whether there had been previous business dealings with debtor that gave rise to a relationship of trust;

3) whether the debt was incurred for personal or commercial reasons;

4) whether there were any "red flags" that would have alerted an ordinarily prudent lender to the possibility that the representations relied upon were not accurate;

5) whether even minimal investigation would have revealed the inaccuracy of the debtor's representations.

*Citizens Bank of Washington v. Wright (In re Wright)*, 299 B.R. 648, 659-60 (Bankr. M.D. Ga. 2003).

To survive summary judgment, Plaintiffs must establish the existence of a genuine issue of material fact as to whether they reasonably relied on the Debtor's 2009 PFS and 2012 PFS in making their decision to purchase the Independence Tracts and enter into the subsequent Settlement Agreement. Because the Court finds that questions of fact remain as to the Plaintiffs' reliance on the Debtor's personal financial statements, the Debtor is not entitled to summary judgment.

**1. The 2009 PFS**

The Debtor argues that Plaintiffs could not have relied on the 2009 PFS because it was provided to the Plaintiffs on January 19, 2009 after they made their decision to purchase the Independence Tracts, which the Debtor contends was made at the time Plaintiffs

designated the Independence Tracts as the replacement properties for their 1031 Exchange[13].

The designation of a replacement property does not result in a legal obligation to purchase the designated property; it is simply a requirement to qualify for the tax benefits of a "like-kind" exchange. *See* 26 U.S.C. § 1031(a)(3). While it may have resulted in severe tax consequences, Plaintiffs could have chosen to forgo the purchase of the Independence Tracts at any time after the § 1031 designation. Accordingly, the date that the Plaintiffs designated the Independence Tracts as the replacement properties for their 1031 Exchange is not necessarily determinative of when their decision to purchase the properties was made. However, it is certainly a factor that the Court will consider, at trial, in determining whether the  Plaintiffs relied on the 2009 PFS.

The Plaintiffs argue that the closing on the Independence Tracts did not occur until March 23, 2009, over two months after they received the Debtor's 2009 PFS. Accordingly, the Plaintiffs argue that they did in fact rely on the Debtor's 2009 PFS in making their ultimate decision to purchase the properties and enter into the Buy-Back Agreements with the Debtor. In fact, Pannell testified at his deposition that the Plaintiffs relied heavily on the 2009 PFS because "it was essential that [the Debtor] have the proven financial ability to buy back [the Independence Tracts] at the end of the three-year period. . . ." (Adv. Dckt. 31, p. 44-45).

The Debtor also argues that even if the Plaintiffs did rely on the 2009 PFS, such reliance was not reasonable as a matter of law. The Debtor asserts that Plaintiffs' reliance

---

[13]Although the exact date of the designation is disputed, the parties agree that it occurred at least prior to January 9, 2009.

was not reasonable because they failed to investigate any of the representations in the Debtor's 2009 PFS despite numerous "red flags" contained in the financial statement. According to the Debtor, the 2009 PFS contained the following "red flags":

- The financial statement was not signed by Debtor.

- The financial statement was not dated by Debtor.

- The only date on the financial statement was a typed date of June, 2008, which was seven months prior to the date the statement was provided.

- On the first page, Debtor checked that he had no contingent liabilities but then, on the very next page, he listed two contingent liabilities under the Contingent Liabilities section of the financial statement.

(Adv. Dckt. 22, p. 15).

In response, the Plaintiffs argue that they had no reason to question the veracity of the 2009 PFS because it appeared consistent with their knowledge of the Debtor's family (and their highly profitable business), the Debtor's wealthy lifestyle, and the Debtor's general reputation[14]. (Adv. Dckt. 48, p. 21). *See In re Bratcher*, 289 B.R. 205 (Bankr.M.D.Fla.2003) (holding reliance was reasonable, in part because the debtor had a good reputation in the community and had a wealthy family with valuable assets); *see also In re Davenport*, 508 Fed. Appx. 937, (11th Cir.2013)(finding of reasonable reliance not clearly erroneous when, among other things, creditor took into account debtor's education, job, and family's

---

[14]According to Plaintiffs, Graham Sadler, a commercial realtor and long-time friend of Coker's, introduced Pannell to Coker during Pannell's search for investment property. (Adv. Dckt. 44, p.13-16, 25-28). Further, both Pannell and Gray contend that they knew Coker generally as a man from an "extremely wealthy family who was well educated, was involved in a "billion dollar" family business in South Carolina, had worked as an executive at that company for a number of years, and was married to the daughter of one of their former law partners. (Adv. Dckt. 31, p. 9; Adv. Dckt. 32, p. 14-15).

AO 72A
(Rev. 8/82)

reputation in the community).

Further, the Plaintiffs argue that the "red flags" described by the Debtor did not prompt the need to investigate the Debtor's 2009 PFS. First, the Plaintiffs contend that it was unnecessary for the financial statement to be signed because the Debtor represented in his January 19, 2009 e-mail that it was his. (Adv. Dckt. 48, p. 20). *In re Eckert*, 221 B.R. 40, 44 (Bankr. S.D. Fla. 1998) ("[w]hile there is no requirement under Section 523(a)(2)(B) that the debtor sign the financial statement, the debtor must affirm the writing in some respect, by using or adopting it"). The Plaintiffs also argue that although the 2009 PFS bore a legend of "Jun-08" the Debtor implied in his January 19, 2009 e-mail that the financial statement was current and he testified in a 2014 deposition that it was current. (Adv. Dckt. 39, p. 85-86). *Hurston v. Anzo (In re Anzo)*, 547 B.R. 454, 467 (Bankr. N.D. Ga. 2016) ("even if a financial statement becomes stale by the passage of time, if the debtor reaffirms that his or her financial condition has not changed . . . any staleness may be cured).

The Plaintiffs also dispute that no investigation was done into the items contained in the 2009 PFS. Specifically, Plaintiffs contend that Pannell was familiar with the Debtor's Bluffton home and thought the listed value of $2.5 million was a fair estimate. In addition, Plaintiffs assert that they compared the 2009 PFS with the Debtor's tax returns and found no glaring discrepancies.

The Plaintiffs have demonstrated that several issues of fact remain as to the their reliance on the Debtor's 2009 PFS. Accordingly, the Court finds that summary judgment is not appropriate on the basis that Plaintiffs did not reasonably rely on the Debtor's 2009 PFS.

### 2. The 2012 PFS

The Debtor makes a similar argument with respect to the Plaintiffs' reliance on the 2012 PFS. First, the Debtor argues that the Plaintiffs did not actually rely on the 2012 PFS in making their decision to enter into the Settlement Agreement. The Debtor contends that the Pannell's April 5, 2012 email, which attached a proposed outline of the Settlement Agreement, demonstrates that the Plaintiffs made their decision to accept promissory notes from the Debtor prior to ever receiving the 2012 PFS on April 17, 2012.

However, the Court finds nothing in Pannell's e-mail which conclusively establishes that the Plaintiffs' decision to enter into the Settlement Agreement was made at that time. In fact, Pannell states in the e-mail that the Plaintiffs "look forward to receiving complete financial statements and tax returns from [the Debtor]." Thus, it is reasonable to infer from this language that the Plaintiffs' decision to enter into the Settlement Agreement would be conditioned upon a review of the Debtor's finances and his ability to successfully make payments on the proposed promissory notes. Further, the Settlement Agreement itself obligated the Debtor to deliver a signed financial statement to the Plaintiffs "on or before execution and delivery of the Settlement Agreement." (Adv. Dckt. 23-3, p. 8).

The Debtor also argues that even if Plaintiffs did rely on the 2012 PFS, such reliance was not reasonable. The Debtor contends that Plaintiffs failed to conduct any investigation into the accuracy of the 2012 PFS despite its glaring "red flags" and knowledge of the Debtor's deteriorating financial condition. Like the 2009 PFS, the 2012 PFS was neither signed nor dated. In addition, the 2012 PFS incorrectly listed the debt owed to

Plaintiffs as $1,000,000.00 instead of $2,900,000.00.

The Plaintiffs make the same arguments regarding the reasonableness of their reliance on the Debtor's 2009 PFS. First, the Plaintiffs argue that they thought the representations in the 2012 PFS were accurate because it appeared consistent with their knowledge of the Debtor and his family's wealthy lifestyle. The Plaintiffs further contend that the fact that the 2012 PFS was not signed or dated did not raise a "red flag" because the Debtor stated in his e-mail accompanying the 2012 PFS that it was his "updated financial statement." (Adv. Dckt. 23-3). The Plaintiffs also argue that the incorrect listing of their debt on the Debtor's 2012 PFS was of no concern, as they were largely focused on the sufficiency of the Debtor's assets, namely his $2.4 million Bluffton home, $2 million in marketable securities and the $3 million in life insurance on the Debtor's parents. (Adv. Dckt. 31, p. 104).

The Plaintiffs have demonstrated that several issues of fact remain as to the their reliance on the Debtor's 2012 PFS. Accordingly, the Court finds that summary judgment is not appropriate on the basis that Plaintiffs did not reasonably rely on the Debtor's 2012 PFS.

## IV. CONCLUSION

In their Complaint, the Plaintiffs alleges that their judgment against the Debtor is non-dischargeable under 11 U.S.C. § 523(a)(2)(B) because the Debtor provided false financial statements for the purpose of inducing Plaintiffs to purchase the Independence Tracts and later enter into the Settlement Agreement. The Debtor filed the instant Motion seeking summary judgment on two grounds: 1) the Settlement Agreement's merger clause

bars Plaintiffs from bringing this adversary proceeding; and 2) the Plaintiffs have failed to satisfy the reasonable reliance element of § 523(a)(2)(B)(iii). However, the Court found that the Debtor is not entitled to summary judgment on such grounds.

Following the Supreme Court's reasoning in *Archer*, the Court finds that neither the parties' Settlement Agreement, nor its merger clause, prevents the Court from examining the nature of the Plaintiffs' claims against the Debtor for non-dischargeability purposes. The Court also finds that the Plaintiffs have met their burden in demonstrating that genuine issues of fact remain as to their reliance on the Debtor's 2009 and 2012 PFS and as to whether such reliance was reasonable. Accordingly, the Court will enter a separate order DENYING the Debtor's Motion for Summary Judgment (adv. dckt. 21).

Dated at Savannah, Georgia, this 28th day of March, 2017.


Edward J. Coleman, III, Judge
United States Bankruptcy Court
Southern District of Georgia